Aubrey **MORRIS**, Plaintiff,

v.

**FIDELITY & CASUALTY COMPANY OF NEW YORK and Wheless Drilling Company, Defendants.**

Civ. A. No. 69–1286.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Nov. 25, 1970.

Michael X. St. Martin, O'Neal, Waitz & Henderson, Houma, La., for plaintiff.

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for defendants.

CASSIBRY, District Judge:

On January 19, 1968, the plaintiff Aubrey Morris was employed by the defendant Wheless Drilling Company (Wheless) as a seaman and member of the crew of "Wheless Barge No. 8", defendant's submersible drilling barge which was operating in the navigable waters of Horseshoe Bayou, Louisiana. Defendant, Fidelity & Casualty Company of New York, provided liability insurance for Wheless and the barge. In the course of his employment, plaintiff was manipulating a dump valve handle, when the handle came out of his hands and struck him in the jaw, causing him to be injured. Plaintiff brought suit alleging that his injuries were caused by the unseaworthiness of the barge and the negligence of defendant in failing to provide him with a safe place to work.

The defendants have offered several defenses, the first being a release which was signed by the plaintiff shortly after a state workmen's compensation settlement was confected between the plaintiff and defendants. The release is a standard form maritime release which alleges that the plaintiff was given Three Hundred Fifty Dollars ($350.00) in return for giving up all of his rights against the defendants under the Jones Act and the General Maritime Law.

It is well settled in the law that one who alleges a seaman's release as a defense must affirmatively prove every aspect of the release. In Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 the United States Supreme Court stated that the burden "is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding."

In this case the release negotiations were initiated by the defendant, which instructed its attorney to take a release from the plaintiff for $350.00. This amount may represent a fair workmen's compensation settlement, but it is woefully inadequate as a maritime settlement, in view of the extent of plaintiff's physical injuries which include severe fracture of both sides of his lower jaw, requiring his jaws to be wired shut for approximately five weeks, the loss of four teeth which had been fractured or loosened, and the loss of about seven weeks' wages at $180 per week. Under the maritime law plaintiff had an absolute right, regardless of fault, to maintenance payments which would be nearly equal to the settlement; he also had the possibility of recovering damages. Of course the amount of the settlement is not, in itself, determinative of the validity of a seaman's release. But an inadequate settlement adds greatly to the defendant's burden of proving that no advantage was taken of the seaman's rela-

tively weaker bargaining position. Garrett v. Moore-McCormack Co., Inc., *supra*.

The proceedings in the state court, whereby the workmen's compensation release was judicially approved, did not refer to a maritime release or give any indication that the releasing party was a seaman. In fact, the maritime release was signed out of the presence of the state judge.

■ Plaintiff had no attorney of his own. At the time of trial his court-appointed attorney had only a vague recollection of the circumstances surrounding the execution of the release. Although he testified that it is his custom to explain to his charges all their rights, it is questionable whether he was able to do this in view of his own statement that he considered this an adequate workmen's compensation settlement but, "[w]hether it is a good maritime settlement or a bad one, I do not go into that." Although advice of counsel is an important factor in determining whether a seaman's release was made with full understanding of his rights, it cannot be decisive, especially in a case such as this one, where the attorney himself appears not to have been aware of such rights.

Plaintiff's uncontradicted testimony is that he did not read the maritime release nor was it read to him. He testified that he "looked at it" and "went over it" but that he is "not a very good reader." Defendant's attorney testified that, to the best of his recollection, the release was not read, but that plaintiff's rights were explained to him.

Plaintiff further testified that he did not understand that he could obtain counsel of his own choosing, and that he had the possibility of receiving a much larger amount of money under the Jones Act and the General Maritime Law. He testified that he was told he would not get any more than the $350.00 and he was lucky to get that and that he ought to go ahead and sign the release.

■ Defendant has not affirmatively provided that plaintiff did in fact understand his rights or that they were clearly explained to him. For these reasons the release will be set aside.

At the time of his injury, plaintiff was working as a derrick man on defendant's barge. His duty was to operate the valve on the mud tank which regulates the flow of mud from the tank to the well. The valve is opened and closed by means of a handle consisting of a three foot length of pipe protruding about five inches from the tank and running parallel to it. The handle moves in a 90-degree arc from a level slightly above the head of a man of ordinary height when it is in the closed position into a position perpendicular to the deck when it is open.

It is the duty of the derrick man to pull the handle down thus opening the valve, allowing mud to flow from the tank, and to hold it in this position until he determines that the proper amount of mud has been dumped. He then raises the handle to the horizontal position which closes the valve, stopping the flow of mud. It requires very little pressure to hold the handle in the down position, but once the operator begins to raise the handle, the hydraulic pressure within the tank creates a pull upon the valve, which in turn exerts a considerable pressure on the handle driving it up rapidly and with force. The operator must hold the handle tightly to prevent its violent ascent. If the operator's hand comes off at any time, the handle will probably fluctuate up and down several times rapidly and with great force. There is no safety device to lock the handle in the down position or to stop its movement if it is released.

The derrick man works on a walkway alongside the tank. The walkway is thirty inches wide, allowing him only two feet of working area clear of the handle's swing. The outer edge of this walkway has no guard rail or other protection to prevent a dangerous fall into the water if the derrick man should stand too close to the edge.

■ It is well settled in the law that an owner does not have the obligation to

provide an accident free vessel, but only to furnish a vessel and appurtenances reasonably fit for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). As the Court said in Lester v. United States, 234 F.2d 625 (2d Cir. 1956), "[t]he crucial consideration is whether [the ship] was, * * * in all respects pertinent to the injury, reasonably fit to permit [the plaintiff] to perform his task aboard the ship with reasonable safety."

The question, then, is whether a dump valve handle is to be considered reasonably safe when it is prone to fluctuate with great force if it is released, with no device to stop or retard its motion nor to protect the operator who must necessarily stand very close to it. I think that such a mechanism is not reasonably fit to permit a worker to perform his task with reasonable safety.

The defendant has presented evidence to show that this type of equipment is customarily used on mud tanks in this area, that it is part of the original construction of the rig and that it was designed to fill the need for a quick acting dump valve which is relatively free of the troublesome problems of clogging from sand and mud, and of corrosion due to salt and spray. This, of course, is evidence in favor of a finding that this is a reasonably safe device, but it is not determinative. What is customary in a trade may be evidence of what constitutes reasonable fitness but it is not the legal measure. June T., Inc. v. King, 290 F.2d 404 (5th Cir. 1961).

A vessel is not required to have the best or most modern equipment; the fact that there is better or safer equipment to do a job is not even admissible to establish a standard of safety or fitness, though it is admissible for other purposes. Doucette v. Vincent, 194 F.2d 834 (1st Cir. 1952). But when, as in this case, the equipment used is not reasonably safe, it is no defense to show that other safer equipment would be less efficient and more difficult to maintain. The duty to provide seaworthy equipment is absolute. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

Defendants contend that plaintiff was the sole cause of the accident or that he was contributorily negligent in letting the handle slip from his hand and in placing himself in the path of the handle.

It is a basic rule of safety that a person should not stand in the path of moving equipment. Raising or lowering the pump handle does not actually require that the operator's body be in the path of travel. However, in view of the conditions already mentioned, the very narrow working area unprotected on its outer edge, the length of time the handle must be manually held down, and the force required to control the handle while it is being raised, it would be unrealistic to suppose that the operator has the option to remain safely away from the handle's path of travel.

The evidence was inconclusive as to whether the plaintiff accidentally let the handle slip from his grasp or whether it was jerked from him by a sudden burst of pressure. Therefore the defendant has not sustained its burden of proving that the plaintiff was contributorily negligent.

There remains then the question of damages, which have been briefly discussed earlier in this opinion. Plaintiff's physical injuries consisted principally of fractures of both sides of the lower jaw, with the fracture on the left side also involving the joint on that side. The oral surgeon testified that it would not be practical to restore the bones to their original position and that they were allowed to heal in the wrong position. He testified that this would not affect their function and that the only residual would be a "clicking" upon opening and closing the mouth and a tendency to "favor" the joint which had been broken, with resultant weakening of the muscles on that side. To permit proper

healing it was necessary to wire the plaintiff's jaws shut for approximately five weeks, during which time he could not take solid food and could speak only with some difficulty. He also suffered a moderate laceration under the chin and lost four teeth which had been fractured or loosened by the accident. In view of plaintiff's physical injuries, his pain and suffering, loss of teeth and loss of wages, I find that he has been damaged in the amount of $9,260. Counsel for plaintiff will submit a formal judgment for that amount, together with five (5) per cent interest per annum from date of judgment until paid, and for all costs of this action.