Albert JACKSON, Plaintiff,

v.

**DELAWARE RIVER AND BAY AUTHORITY, Defendant.**

No. CIV.A. 03–1236(JEI).

United States District Court,
D. New Jersey.

Feb. 27, 2004.

E. Alfred Smith & Associates, By E. Alfred Smith, Esq., Philadelphia, PA, Counsel for Plaintiff.

Donna Adelsberger & Associates, P.C., By Mary Elisa Reeves, Esq., Glenside, PA, Counsel for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE THE RELEASE DEFENSE

IRENAS, District Judge.

This matter having appeared before the Court upon Defendant's Motion for Summary Judgment and Plaintiff's Cross–Motion to Strike the Release Defense, the Court having reviewed the submissions of the parties, and it appearing that:

1. This case is the latest development in what appears to be a long standing dispute between the Plaintiff, Albert Jackson ("Jackson") and the Defendant, the Delaware River and Bay Authority ("DRBA"). Jackson, once an employee of the DRBA, currently seeks to recover damages from his former employer on account of a congenital foot injury allegedly exacerbated by DRBA working conditions.

2. Albert Jackson is a seaman formerly employed by the DRBA as a crew member of various vessels, including the Cape May, Twin Capes and the Delaware. In December, 2000, while still working for the DRBA, Jackson became aware of a painful condition in his feet. After seeing several doctors, including one recommended by the DRBA, Jackson was told that he required orthotic shoe implants. Jackson alleges that the DRBA negligently failed to furnish him with orthotics. This failure has resulted in operations to Jackson's feet, additional knee injuries and emotional distress. It has also apparently rendered Jackson completely unable to work.

3. Jackson filed his Complaint pursuant to the Jones Act, 46 U.S.C.App. § 688, and general maritime law.[1] He specifically seeks: (1) damages resulting from the DRBA's failure to pay maintenance and cure in connection with the foot condition; (2) punitive damages based on the DRBA's negligent failure to provide orthotics; and (3) a retroactive wage increase for the final months of his employment, based on union negotiations that concluded after his employment.[2]

---

1. Jackson actually tiled two Complaints in the instant action, but Magistrate Judge Donio consolidated them is an Order dated October 24, 2003.

2. Though the Court finds these claims barred by the release Jackson executed in connection with a prior case against the DRBA, there is no implication that the claims would be valid but for the settlement. Jackson's second

4. The legal history between Jackson and the DRBA, however, begins before the Complaint was filed in this action. Jackson was one of three plaintiffs who previously brought a racial discrimination case against the DRBA in 2002. On the second day of trial before Judge Simandle, June 12, 2002, the parties executed a handwritten memorandum which specifically stated that Jackson was releasing "all claims" against the DRBA. (Def's Ex. 12). Shortly thereafter, Judge Simandle held a hearing on the record to make certain that Jackson and his co-plaintiffs understood and accepted the terms of the settlement. Jackson replied affirmatively. (Def's Ex. 11).

6. The settlement was formalized and executed on July 1, 2002. According to its terms, Jackson received a lump sum payment of $125,000.00 and an acceleration of his retirement pension. (Def's Ex. 4). The pension payments are collectively worth $135,165.96. The settlement also extends life, health, dental and vision insurance coverage to Jackson and his wife.

7. In addition to releasing his claims against the DRBA, Jackson agreed to: (1) resign his employment, effective June 16, 2002; (2) never seek employment with the DRBA in the future; and (3) restrict himself to only that DRBA property which was open to the public. The DRBA's counsel explained that because of Jackson's propensity to file complaints and claims during his tenure with the DRBA, the settlement was designed to "buy peace entirely." (Def's Ex. 15 at 31–32, 41–43, 50–51).

8. The DRBA brings its current motion for summary judgment on the theory that Jackson's present claims are barred by the terms of the settlement agreement and Jackson's release of all present and future claims.[3] Jackson cross-moves to strike the release as a defense to his claims. The Court will grant the DRBA's motion for summary judgment and deny Jackson's motion to strike the release as a defense. Original jurisdiction to hear this action at maritime law is based on 28 U.S.C. § 1333.

9. The issue present in this case is the validity of the release of all future claims as specified in the settlement between Jackson and the DRBA of July 1, 2002. According to the Supreme Court, seaman are entitled to special protection in legal matters, and accordingly, there is a two-part test to determine the enforceability of a seaman's release. *Garrett v. Moore–McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). First, a court must determine whether the release was executed freely, without deception or coercion. *Id.* at 248, 63 S.Ct. 246. Sec-

---

claim, a request for punitive damages, is particularly troubled as punitive damages may not be awarded in a seaman's personal injury case under the Jones Act. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 111, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *O'Connell v. Interocean Management Corp.*, 90 F.3d 82 (3d Cir. 1996); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5–17 (3d ed.2001).

**3.** The relevant provision of the settlement agreement reads:

For good and valuable consideration received and/or to be received as set forth below, Jackson hereby releases and discharges the DRBA ... (Releases) ... from any and all actions, causes of actions, suits ... and demands of every nature and description whatsoever, in law or equity ... including, but not limited to ... compensatory damages, punitive damages, attorney's fees, costs, and any claims which were or could have been asserted in the Lawsuit and all other claims and causes of action of every nature and description which Jackson ... ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, cause action or thing whatsoever whether known or unknown from the beginning of the world to the date of this Release. (Def's Ex. 4 at 1. 2).

ond, a court must examine whether the seaman entered the settlement with a full understanding of his rights. *Id.* The adequacy of consideration and the nature of the medical and legal advice available to the seaman are key issues in the analysis of this understanding. *Id.*

10. As to the first element of the *Garrett* test, there was no deception or coercion in the negotiation of Jackson's release. The settlement reached between Jackson and the DRBA was the product of significant negotiation between the parties, and Judge Simandle held a special hearing to ensure that the decision was freely and voluntarily made. During that hearing, Jackson's attorney specifically stated that the settlement was only reached "after going back and forth for hours." (Def's.Ex. 11). Further, Judge Simandle directly asked Jackson whether he entered the agreement voluntarily. Jackson replied affirmatively. *Id.* It cannot be said that there was any coercion or deception that took place during the negotiation of the settlement.

11. Jackson obviously disagrees with this notion, but his description of deception and coercion is in fact unrelated to the negotiation of the settlement. Jackson argues that Leo Long of the DRBA's Benefits Department and Bonnie Miller of DRBA Risk Management consistently mislead him while he pursued an administrative remedy for his foot injury. Jackson further maintains that Mr. Long and Ms. Miller's alleged misbehavior caused him to believe that his foot condition was not a legitimate claim—that because it was congenital, he could not recover against his employer for it. (Pl's.Br.6–9).

12. Nevertheless, this argument only addresses the initial handling of Jackson's foot condition, not the negotiation of his release of all claims on June 12, 2002. A court must examine "whether there is any appearance of 'taint or fraud, deception, coercion or overreaching ... in the negotiations eventuating in the settlement.'" *Borne v. A & P Boat Rentals No. 4, Inc.,* 780 F.2d 1254, 1257 (5th Cir.1986) (*quoting Strange v. Gulf & South American Steamship Co., Inc.,* 495 F.2d 1235, 1236 (5th Cir.1974)). There is nothing in this case to suggest that the *negotiations* on the second day of trial before Judge Simandle were deceptive or coercive in any way, and therefore, this Court finds that the release was executed freely.

13. The second element of the *Garrett* test to evaluate the enforceability of a seaman's release is an examination of whether upon entering the release, the seaman fully understood his rights. Of note in making this determination is the adequacy of consideration and the nature of legal and medical advice given to the seaman. In this case, Jackson is a sophisticated and experienced litigant. This Court finds little doubt that he entered into the settlement agreement with a full understanding of the claims he was relinquishing. Further, Jackson received ample consideration for his release, and he was well appraised of his medical and legal situation while negotiating.

14. Jackson naturally argues here that he was unaware of the full impact of releasing "all" of his claims against the DRBA in the July 1, 2002 settlement. In assessing that notion, some discussion of Jackson's litigious history is warranted.

15. Jackson has filed no less than eight injury reports with the DRBA during his employment, for injuries including a finger puncture, stomach muscle strain, a concussion sustained from a falling lifeboat and a headache from paint fumes. (Def's Ex. 1 at 27–40). Jackson has initiated at least three lawsuits against the National Maritime Union on claims ranging from RICO

violations and racketeering to a contract violation. In two of those cases, Jackson signed releases in exchange for a significant monetary settlement, as he did here. (Def's Ex. 1 at 41–49). Jackson has also sued at least three former employers: Farrell Lines, Texaco, and Gulf Oil. (Def's Ex. 1 at 49–56). The lawsuit against Farrell Lines was for a knee injury, and it settled for $35,000.00. *Id.* Jackson has also filed multiple claims with the Equal Employment Opportunity Commission ("EEOC") and the National Labor Relations Board.

16. As a plaintiff before Judge Simandle on June 12, 2002, therefore, Jackson was no stranger to a courtroom or to settlement negotiations. Having settled at least three cases, likely more, prior to that date, it is hard to believe that he did not understand that a release of "all" claims against the DRBA would preclude further action against his employer. This idea is bolstered by the fact that a Mr. McKoy, a co-plaintiff before Judge Simandle, orally preserved a workers' compensation claim in his settlement agreement with the DRBA.[4] From McKoy's example, it should have been clear to Jackson that if he wanted to preserve any claims, he would have to specify them in the settlement agreement.

17. In further arguing that his understanding of his rights at the time of settlement was incomplete, Jackson contests that he was unaware of any potential claim arising from his congenital foot condition. This argument appears to be at least partially untrue. Prior to the settlement, Jackson had actively pursued a claim for maintenance and cure with the DRBA. Jackson filed a grievance with the DRBA (Pl's.Ex. 14), and subsequently filed an EEOC grievance listing his foot injury (Def's. Ex. 1 at 101–05). Further, Jackson had active discussions with his attorney about the foot injury claim in August, 2001, evidenced in an email he wrote on the subject. (Def's.Ex. 26). Though Jackson now maintains that he was unaware of his foot injury claim at the time of settlement, Jackson's prior behavior betrays a keen awareness of legal options.

18. The *Garrett* opinion also counsels that a court should look to the adequacy of consideration and the medical and legal advice available to a seaman in determining whether he fully understood his rights at the time of settlement. *Garrett*, 317 U.S. at 248, 63 S.Ct. 246. The consideration that Jackson received in the settle-

---

4. The specific excerpt from the hearing before Judge Simandle on June 12, 2002, reads as follows:

Mr. Grassi: You understand all those terms, and all the terms written on the paper you're comfortable with and you accept it?
Mr. McKoy: Yes.
Mr. Grassi: You understand that by signing it, by settling it, by having this resolved, that you give up all rights and anything that's subject to this today, this is the end of this, this is finality?
Mr. McKoy: That I do only to this claim. That I do, yes.
Mr. Grassi: Okay. Are there other claims that you have against the DRBA other than this claim pending or present that you feel are not extinguished by this?

Mr. McKoy: That's correct. And I understand. There is a pending—we didn't write it in. There's a pending...
Mr. Kelley: There's unemployment, a workers' compensation claim. It was discussed, your Honor. I discussed it with my clients. For the record, I would indicate that this settlement does not extinguish that claim...
The Court: All right. That was discussed.
Mr. Grassi: Okay.
The Court: And so that claim for workers' compensation is preserved.
Mr. Grassi: All right.
Mr. Kelley: And when the release is drafted, I will put that in the release, your Honor. (Def's.Ex. 11).

ment was more than adequate. The settlement featured a lump sum payment of $125,000.00 and an acceleration of Jackson's retirement benefits valued at $135,165.96. Jackson seems to argue that because there was no amount specifically allocated to his foot claim in the prior settlement, the overall consideration paid was inadequate.

19. While the foot injury is not mentioned in the settlement itself, Jackson fails to note that the DRBA's insurance carrier paid only $35,000.00 for the discrimination claim in the prior case. The $90,000.00 remainder of the lump sum and the entire retirement package was paid by the DRBA to essentially buy a release of all possible claims and sever the relationship with Jackson entirely. The potential foot claim certainly falls under that compensatory umbrella. Further, cases overturned for inadequate compensation generally do not involve amounts in excess of $250,000.00. *See Morris v. Fidelity & Casualty Co. of N.Y.*, 321 F.Supp. 320, 1971 AMC 695 (E.D.La.1970) (finding $350.00 an inadequate settlement for a broken jaw where plaintiff had a court-appointed attorney); *Borne*, 780 F.2d at 1256–57 (finding only $9,000.00 an adequate settlement for a back injury where negotiations were fairly conducted by attorneys).

20. Jackson was also in possession of ample medical and legal advice. He consulted two doctors about his foot condition, Dr. Michael Prime and Dr. Michael Contrella. (Def's.Ex. 21, 22). There is no doubt that Jackson was medically aware of his foot condition when he released all claims against the DRBA. Jackson was also represented by counsel throughout the prior lawsuit and the settlement negotiations by Joseph Grassi and Sidney L. Gold. Mr. Grassi specifically reviewed the terms of Jackson's release with him. (Def's Ex. 1 at 119). Considering this advice and

Jackson's prior history as a litigant, there can similarly be little doubt that Jackson was fully aware of his legal position during settlement negotiations.

21. The Court finds no deception or coercion in the settlement negotiations in the prior lawsuit, and also finds that Jackson entered into the settlement with a full understanding of his rights. Consequently, the release of all claims that Jackson signed is completely enforceable, and it bars his current suit against the DRBA.

And for good cause shown.

**IT IS** on this 27th day of February, 2004, ORDERED THAT:

1. Defendant's Motion for Summary Judgment is GRANTED.

2. Plaintiff's Motion to Strike the Release Defense is DENIED as moot.