# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 8
In the Matter of New York City
Asbestos Litigation.

Ann M. South, &c.,
  Respondent,
   v.
Chevron Corporation, &c.
  Appellant,
et al.,
  Defendant.

Meir Feder, for appellant.
Louis M. Bograd, for respondent.
Association of American Railroads, amicus curiae.

WILSON, J.:

Mason South and his wife sued Chevron Corporation[1] and several other defendants,

alleging that the defendants are responsible for causing his mesothelioma, from which he

---

[1] Chevron is sued as successor by merger to Texaco, Inc., aboard whose ships Mr. South worked in the 1950s.

died in May 2015. Chevron moved for summary judgment based on a release Mr. South signed when he settled a 1997 lawsuit he filed against Texaco, Inc. and many other defendants, based on his exposure to asbestos. Supreme Court denied Chevron's motion for summary judgment, reasoning that the record at this stage of the proceedings does not meet Chevron's heightened burden, under the Federal Employers' Liability Act (FELA) and admiralty law, to demonstrate that the release forecloses the claims in the present lawsuit. The Appellate Division affirmed, with one Justice dissenting (153 AD3d 461 [1st Dept 2017]), and certified to this Court the question of whether its order was properly made. We answer that question affirmatively.

I.

Mason South worked shipboard as a merchant marine from 1945 to 1982, at which point he retired. During 1953-1955, he worked aboard ships owned by Texaco. In 1997, fifteen years after his last voyage, he, along with hundreds of other plaintiffs, filed individual lawsuits against Texaco and 115 other defendants (including both shipowners and asbestos manufacturers), in the United States District Court for the Northern District of Ohio. All of these plaintiffs were represented by the Jaques Admiralty Law Firm, which also used the name "Maritime Asbestosis Legal Clinic." Mr. South's lawsuit alleged that he "spent his life as a seaman . . . plying the waters" during which time, on ships owned by Texaco and others, he was "exposed to asbestos friable fibers causing him to breathe into his system carcinogenic asbestos dust."

A few weeks after Texaco was served with Mr. South's complaint, Texaco reached a settlement with Mr. South and other plaintiffs represented by the Jaques Admiralty Law Firm. The settlement between Texaco and Mr. South was effectuated by the entry of a judgment of dismissal with prejudice of all the claims brought by Mr. South as well as by a release executed by Mr. South, dated December 26, 1997. Although Chevron asserts, without challenge, that Texaco made a single lump-sum payment to settle the claims against it in all the maritime asbestos cases brought in the Northern District of Ohio, the record does not contain any evidence of the number or identity of the cases settled, the amount paid by Texaco, or the basis for distribution of the settlement amount to individual plaintiffs. Plaintiffs claim that Mr. South's share of Texaco's total settlement payment was $1,750, which Chevron does not dispute. Chevron alleges that Texaco was not involved in the determination of what portion of the total sum it paid in settlement would be paid to Mr. South, which plaintiffs do not dispute.

Two decades later, on February 4, 2015, Mr. and Mrs. South filed the instant lawsuit in New York Supreme Court against Chevron (as successor by merger to Texaco) and several other defendants, seeking to recover for Mr. South's "serious, incurable and progressive asbestos-related disease" resulting from his exposure to asbestos shipboard, "during the years 1945 through 1982." As against Chevron, the lawsuit pleaded three causes of action: (I) a claim under the Jones Act, 46 USC § 30104; (II) a claim under federal admiralty and maritime law; and (III) a claim on behalf of Mrs. South for loss of

consortium.  When Mr. South passed away, his estate was substituted for him in this lawsuit.

Chevron, relying on the 1997 release, moved for summary judgment in Supreme Court. Supreme Court denied the motion on the ground that the record did not unequivocally demonstrate the validity of the release under Section 5 of FELA.  The Appellate Division affirmed.  Like Supreme Court, the Appellate Division concluded that the record did not demonstrate Chevron's entitlement to summary judgment, because the release did not specifically mention mesothelioma, which then required the court to determine whether extrinsic evidence entitled Chevron to summary judgment.  Pointing to the "meager consideration" and the lack of any diagnosis of mesothelioma as to Mr. South at the time he settled, the Appellate Division concluded that the record left open the question of whether the release pertained to an existing pulmonary condition and the fear of some future asbestos-related disease, or if it was intended to release all future asbestos-related diseases arising from Mr. South's employment by Texaco.  The parties agree that, at the time he executed the release, Mr. South suffered from a nonmalignant pulmonary disease but not from mesothelioma or cancer.

## II.

"To grant summary judgment, it must clearly appear that no material and triable issue of fact is presented" (Glick & Dolleck, Inc. v Tri-Pac Export Corp., 22 NY2d 439, 441 [1968]).  "Summary judgment should not be granted where there is any doubt as to the existence of a factual issue or where the existence of a factual issue is arguable" (Forrest v

Jewish Guild for the Blind, 3 NY3d 295, 315 [2004], citing Glick, 22 NY2d at 441]).  On

summary judgment, "'facts must be viewed in the light most favorable to the non-moving

party'" (Vega v Restagno Constr. Corp., 18 NY3d 499, 503 [2012], quoting Ortiz v Varsity

Holdings, LLC, 18 NY3d 335, 339 [2011]), and "the proponent of a summary judgment

motion must make a prima facie showing of entitlement to judgment as a matter of law,

tendering sufficient evidence to demonstrate the absence of any material issues of fact"

(Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).

Chevron claims the 1997 release entitles it to summary judgment because the release

unequivocally demonstrates that Mr. South previously released the claims he now seeks to

pursue. The sole question presented to us on this appeal is whether Chevron has established

that the release, coupled with the 1997 complaint, eliminates all material questions of fact

and proves that the release bars the claims here as a matter of law.  Answering that question

requires us to consider the protections afforded to Mr. South by admiralty law and Section

5 of FELA (45 USC § 55), which is incorporated into the Jones Act by 46 USC § 30104.

III.

We turn first to the question of whether plaintiffs bear the burden to show the

invalidity of the release or Chevron bears the burden to show its validity. In Garrett v

Moore-McCormack Co. (317 US 239 [1942]), the United States Supreme Court considered

the law applicable to a release executed by a merchant marine in favor of a shipowner.  The

merchant marine brought, in Pennsylvania state court, both a Jones Act claim and an

admiralty claim for maintenance and cure; the Court noted that the two causes of action

were "independent and cumulative" (317 US 239, 240 n 2). The Pennsylvania courts applied their state-law rule that a plaintiff bears the burden to show the invalidity of a release by "clear, precise and indubitable" evidence, instead of the federal admiralty rule that the defendant bears the burden of proving the validity of the release (id. at 242). The Supreme Court reversed, holding that "a seaman in admiralty who attacks a release has no such burden imposed upon him as that to which the Pennsylvania rule subjects him" (id. at 246). Although the Court did not, in that regard, expressly state that it was treating the Jones Act claim as one "in admiralty," it did state that "the Jones Act is to have a uniform application throughout the country, unaffected by 'local views of common law rules,'" (id. at 244 [citing Panama Railroad Co. v Johnson, 264 US 375, 392 [1924]). The Court went on to hold "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights" (317 US at 248).

Six years later, in Callen v Pennsylvania Railroad Co. (332 US 625 [1948]), the Court rejected Callen's argument "that the burden should not be on one who attacks a release, to show grounds of mutual mistake or fraud, but should rest upon the one who pleads such a contract, to prove the absence of such grounds" (332 US 625, 629), thus placing the burden to prove invalidity on the plaintiff—the opposite of the holding in Garrett. Callen concerned a railroad worker, not a plaintiff in admiralty, and its decision did not purport to change the holding in Garrett that in the case of mariners, the burden rests on the employer to prove the validity of the release. Consistent with that Supreme

Court precedent, Chevron acknowledges that <u>Garrett</u> applies to plaintiff's claims and places on Chevron the burden to prove the release's validity.

IV.

The Jones Act incorporates FELA, including Section 5 thereof.  Section 5 provides in relevant part: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void" (45 USC 55).  <u>Callen</u> makes clear that Section 5 does not bar employers from settling claims brought against them by employees: "It is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility. Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation" (332 US at 631).  In subsequent cases, the Court has reiterated that Section 5 does not prohibit a "full compromise enabling the parties to settle their dispute without litigation" (<u>Boyd v Grand Trunk Wester</u>, 338 US 263, 266 [1949]) because "full and fair compromises of FELA claims do not clash with the policy of the Act" (<u>Southern Buffalo v Ahern</u>, 344 US 367, 372 [1953]).

Although the parties here differ as to whether plaintiffs' claims should be evaluated by reference to <u>Babbitt v Norfolk & Western Railway Company</u> (104 F3d 89 [6th Cir 1997]) or <u>Wicker v Consolidated Rail Corp.</u> (142 F3d 690 [3d Cir 1998]), two circuit court cases interpreting <u>Callen</u>, neither case pertains here.  The plaintiffs in those cases were

railroad workers, not mariners like Mr. South, so the decisions did not involve <u>Garrett</u>'s

heightened standard applicable to mariners like Mr. South.

Unlike railroad workers, because Mr. South is a merchant marine, he is entitled to

the heightened protections of admiralty law.  In <u>Garrett</u>, the Supreme Court explained the

policy underlying the admiralty standard by quoting Justice Joseph Story from his time as

a Circuit Judge:

> "[seamen] are emphatically the wards of the admiralty; and though not technically
> incapable of entering into a valid contract, they are treated in the same manner as
> courts of equity are accustomed to treat young heirs, dealing with their expectancies,
> wards with their guardians, and *cestuis que trustent* with their trustees. . . . If there
> is any undue inequality in the terms, any disproportion in the bargain, any sacrifice
> of rights on one side, which are not compensated by extraordinary benefits on the
> other, the judicial interpretation of the transaction is that the bargain is unjust and
> unreasonable, that advantage has been taken of the situation of the weaker party,
> and that *pro tanto* the bargain ought to be set aside as inequitable."

(<u>Garrett v Moore-McCormack Co.</u>, 317 US at 247 [quoting <u>Harden v Gordon</u>, Fed. Cas.

No. 6047 at 480, 485]).   To vindicate those interests, the Supreme Court set out a

heightened standard:  "the burden is upon one who sets up a seaman's release to show [1]

that it was executed freely, without deception or coercion";  [2] "it was made by the seaman

with full understanding of his rights"; [3] "[t]he adequacy of the consideration"; and [4]

"the nature of the medical and [5] legal advice available to the seaman at the time of signing

the release are relevant to an appraisal of this understanding" (317 US at 248 [numbering

added]).   In view of that heavy burden, "summary judgment is often considered an

inappropriate procedure to determine the validity of a [mariner's] release" (Complaint of Bankers Tr. Co. v Chatterjee, 636 F2d 37, 39 [3d Cir 1980]).[2]

Applying that standard to this case, we conclude that Chevron has not met its burden to demonstrate the absence of any material question of fact. The 1997 release does not unambiguously extinguish a future claim for mesothelioma.[3] The release itself does not mention mesothelioma. It does say that Mr. South "is giving up the right to bring an action against the Released Parties, or any of them, in the future for any new or different diagnosis that may be made about Claimant's condition as a result of exposure to any product[.]" But "claimant's condition" may cabin the "new or different diagnosis" to ones that related to his nonmalignant asbestos-related pulmonary disease—the "condition" both parties agree was the only one he suffered at the time. Although, as the dissent notes, Mr. South's 1997 complaint mentioned mesothelioma, the dissent has elided an important portion of the complaint. Mr. South pleaded that he:

> "suffers pulmonary diseases inclusive of asbestosis / mesothelioma / lung cancer / pneumoconiosis / chronic obstructive pulmonary disease / colon cancer / stomach cancer / rectal cancer / kidney cancer / pancreas cancer / pharynx cancer / brain

---

[2] When the dissent complains that the plaintiffs have failed to come forward with evidence (dissenting op at 13), they have silently reversed the burden required by Garrett.

[3] We agree with the dissent (dissenting op at 5) that even maritime employers and employees should be able to settle disputes by releasing claims, and that such releases should not be routinely challenged by searching examinations bearing on the parties' intent, as is necessary here. However, the solution is for parties to write a careful and precise release instead of one that is ambiguous and purports to rely for definiteness on a complaint that itself is facially – perhaps intentionally – vague (cf., Collier v CSX Transp. Inc., 673 Fed App'x 192, 197 [3d Cir 2016] [upholding a release where "(t)he release itself specifically mentioned cancer arising from asbestos exposure"]).

cancer / other anatomical cancer, et cetera, <u>either singularly or in combination thereof</u>."

The complaint does not assist Chevron in resolving the release's ambiguity. First, the parties agree that Mr. South was not, at the time of the release, suffering from most of the above diseases, including mesothelioma,[4] and the complaint's "either singularly or in combination thereof" could be taken to demonstrate Mr. South's lack of knowledge as to his condition at the time he signed the release. Second, the complaint at most demonstrates that both Texaco and Mr. South were aware that all of the above conditions, including mesothelioma, might result from exposure to asbestos, but the absence of mesothelioma (and the other cancers) from the release could readily support the conclusion that the omission of mesothelioma (and the other cancers) from the language of the release was deliberate. The dissent complains that we have set an ["impossibly high"] burden for employers to settle with mariners, but that is not so. First, Garrett sets a high burden, so part of the dissent's complaint is with the requirements of federal law. Second, the dissent appears to forget that the complaint plainly demonstrates that both Texaco and Mr. South knew that asbestos exposure could cause mesothelioma, yet they agreed to a release that omitted it. It would hardly have been "impossible" for Texaco to insist on including

---

[4] The parties agree that Mr. South did not have mesothelioma at the time he signed the release. Instead, they agree he suffered from a pulmonary disease that the record leaves only vaguely described. The dissent's version of the complaint's text, focusing on the words "inclusive of" (dissenting op at 12) would have Mr. South pleading that he had not only mesothelioma, but also colon cancer, stomach cancer, rectal cancer, kidney cancer, pancreas cancer, pharynx cancer, and brain cancer. The parties agree that was not the case, and it would be a mistake to alter the language of the complaint by striking out "either singularly or in combination", as the dissent does when it quotes the language.

mesothelioma in the release.    Indeed, other releases have been upheld in cases where they specifically mentioned cancers arising from asbestos exposure (see e.g. Collier v CSX Transp. Inc., 673 Fed App'x 192, 197 [3d Cir 2016]). Particularly when viewed through the lens required by Garrett, the manner in which the complaint refers to mesothelioma does not meet Chevron's burden to demonstrate the absence of disputed material facts.

The record as thus far developed is silent or ambiguous on most of the factors set forth in Garrett.  The release recites that Mr. South understood he was relinquishing his rights, but the record does not presently establish his "full understanding" of what he was extinguishing.  Mr. South signed the release a few weeks after the case was filed.  He signed it one day after Christmas, while in Florida, represented by counsel located in Ohio.  Some large but unknown number of others represented by the same law firm also settled at the same time.[5]   Although, again as the dissent points out, the release recites that Mr. South consulted with counsel, were the inclusion of such language sufficient to avoid Garrett's heightened standard, the protection guaranteed to mariners under admiralty law would be readily circumventable.  There is no record evidence to show that Mr. South had any communications with counsel about the settlement, other than the transmission of the settlement agreement to him.

---

[5] These are not "extraneous" facts (dissenting op at 15 n 6) as they provide circumstantial evidence suggesting that Mr. South received no meaningful legal advice about the release. He signed the release at a time when the law firm representing him was obtaining releases from "thousands" of other clients (dissenting op at 8), and when he was across the country from his lawyers.  A fair inference from these facts would be that he received no individualized advice and merely signed a piece of paper sent to him.

As to the adequacy of the consideration, nothing in Chevron's summary judgment proffer established the amount paid by Chevron in exchange for Mr. South's settlement and release, although the parties agree that Mr. South received $1,750 from some omnibus amount paid by Texaco to settle his and other claims. We do not know how many cases Texaco settled; how much Texaco paid to settle as a lump sum; how that lump sum was distributed; what the considerations were that led to the allocation of a specific amount of compensation to Mr. South; what, if anything, Mr. South received from the 115 other defendants he sued; or what he or his counsel viewed as the value of those remaining claims (which he expressly carved out of the release) at the time he settled with Texaco.

With respect to medical advice, the record is completely silent, other than the parties' agreed-upon assertion that Mr. South had a pulmonary disease but not mesothelioma or cancer when he signed the release. By contrast, in <u>Jackson v Delaware Riv. & Bay Auth.</u>, the court, applying <u>Garrett</u>, pointed to a seaman's consultations with two doctors as evidence of his receipt of adequate medical advice (334 F Supp 2d 615 [DNJ 2004]; <u>see also</u> <u>Sitchon v Am. Export Lines, Inc.</u>, 113 F2d 830, 832 [2d Cir 1940]). Here, no medical records documenting Mr. South's condition when he signed the release are in the record.

On the other hand, we do know that Mr. South was represented by counsel, which weighs in favor of finding the release valid. "[T]he need for the Court to determine whether a seaman fully understood his rights when executing a release is reduced when a seaman is represented by counsel" (<u>Nicolich v City of NY</u>, 1996 US Dist LEXIS 2646, at *6

[SDNY Mar. 5, 1996, 95 Civ. 0053 (AGS)]). Similarly, the Fifth Circuit has held that "[w]hen a seaman is acting upon independent advice and that advice is disinterested and based on a reasonable investigation, there being no question of competence, a settlement agreement will not be set aside" (Borne v A & P Boat Rentals No. 4, Inc., 780 F2d 1254, 1258 [5th Cir 1986]). Although representation by counsel helps establish the validity of a release, here Supreme Court indicated that the competence of Mr. South's 1997 counsel in connection with its mass representation of maritime asbestos plaintiffs had been consistently questioned, which is also not fleshed out in the record (but see In re U.S. Lines, Inc., 318 F3d 432, 434 [2d Cir 2003] [noting the Jaques Admiralty Firm's pursuit of a "risky" "unwise and dilatory volume strategy" in the context of settlement negotiations, including failing to provide documentation specific to individual plaintiffs]; In re U.S. Lines, Inc., 216 F3d 228, 231 [2d Cir 2000]).

To be clear, it is possible that additional evidence could be developed that would validate the release and extinguish plaintiffs' claims. However, applying Garrett's heightened standard in the summary judgment posture, the record is presently insufficient to demonstrate the effectiveness of the 1997 release as a matter of law.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Matter of NYC Asbestos Litigation (South v Chevron)

No. 8

GARCIA, J. (dissenting):

More than twenty years ago, plaintiff, a merchant marine, sued a ship owner for injuries related to alleged asbestos exposure sustained while serving aboard the owner's vessel. The parties swiftly settled and, in exchange for compensation, plaintiff executed a

- 1 -

comprehensive release, agreeing to forfeit "any and all" claims for known or potential injuries suffered as a result of his alleged exposure. Despite that release, the same seaman, with the same counsel, is again suing the same ship owner for injuries sustained from that same asbestos exposure. The majority declines to enforce the parties' agreement, holding that defendant failed to meet its burden of demonstrating the validity of the release.

I disagree. Defendant carried its burden, and plaintiff has not suggested, let alone raised, any facts to the contrary. By denying summary judgment, the majority seemingly renders all releases executed by seamen – no matter how comprehensive – unenforceable in New York courts. That result harms both defendants seeking certainty in settlement and plaintiffs hoping to avoid the risk and expense of litigation. Accordingly, I dissent.

I.

In 1997, plaintiff Mason T. South filed suit against 117 defendants, including Texaco Inc., alleging claims under federal admiralty law and the Jones Act (46 USC § 30104). In the complaint, plaintiff alleged that, throughout his 37-year career as a merchant marine, he "was constantly exposed to asbestos friable fibers," which "caused the devastating pulmonary disease [he] now suffers." Plaintiff asserted that he "suffer[ed] harm in the form of necessity to be monitored for other asbestotic diseases including lung cancer," and sought damages for "being forever medically monitored for disease onset and worsening." The complaint further alleged that, "[a]s a direct and proximate result of said exposure to asbestos . . . [p]laintiff suffers cancerphobia . . . , pneumoconiosis as well as exacerbation of existing diseases; and . . . pulmonary diseases inclusive of . . .

mesothelioma." Plaintiff served aboard ships owned by Texaco for approximately twenty months.

Less than two months after filing suit, plaintiff and Texaco reached an agreement to settle plaintiff's claim. In exchange for $1,750, plaintiff agreed to release Texaco from "any and all claims for damages as alleged, or which could be alleged, for the injuries, sickness and/or disease allegedly caused as a result of the exposure to asbestos, silica, asbestos fibers, and asbestos dusts, and/or silica or asbestos-containing products, smoke and carcinogenic chemicals (not including benzene or products containing benzene)." The release also represented that plaintiff:

> "understands that the long term effects of exposure to asbestos substances . . . may result in obtaining a new and different diagnosis from the diagnosis as of the date of this Release. Nevertheless, [plaintiff] understands that by entering into this agreement, he is giving up the right to bring an action against [defendant] . . . in the future for any new or different diagnosis that may be made about [plaintiff's] condition as a result of exposure."

Plaintiff specifically forfeited all claims for harm "on account or in any way arising out of any and all known or unknown, present or future, foreseen or unforeseen bodily and/or personal injuries, sickness or death," including those claims "which may accrue in the future."

The text of the release clarified that it "d[id] not amount to an admission of any kind of liability" by Texaco. Rather, Texaco "denie[d] any and all liability for any damages," but agreed to settle "any and all claims" arising out of plaintiff's alleged exposure "in order

to resolve the dispute between the parties, and to forever terminate the claims asserted, or which could be asserted."

Before signing the release, plaintiff acknowledged the following:

"I HAVE CAREFULLY READ THE FOREGOING RELEASE, HAVE DISCUSSED THE CONTENTS THEREOF WITH MY ATTORNEY AND AM SIGNING THIS RELEASE OF MY OWN FREE ACT, WITH FULL KNOWLEDGE OF THE CONTENTS AND THE PURPOSE OF THIS RELEASE, INTENDING . . . TO BE FOREVER LEGALLY BOUND."

Plaintiff also swore before a notary public that he had read the release and fully understood its terms. Plaintiff, two witnesses, and a notary signed the release. The complaint was subsequently dismissed as against Texaco, with prejudice.

In 2015, plaintiff, using the same counsel retained in 1997, again filed suit against Texaco for his alleged asbestos exposure, claiming damages for plaintiff's subsequent diagnosis of mesothelioma.[1] The 2015 complaint asserts the same causes of action as the 1997 complaint, as well as a claim for loss of consortium on behalf of plaintiff's wife. Defendant moved for summary judgment, citing the 1997 release as a complete bar to plaintiff's present claim.

Plaintiff admits to signing the release, but claims that he should not be bound by it. Specifically, in opposition to defendant's motion, plaintiff argues that the release is unenforceable under federal law because: "1) the language Texaco relies upon is

---

[1] Plaintiff sued Chevron Corporation as the successor in interest to Texaco Inc. For clarity, I will refer to the party as "Texaco" or "defendant."

boilerplate language insufficient to indicate intent; 2) the release failed to mention any form of cancer, let alone mesothelioma, and; 3) the settlement amount of the 1997 release indicates that [plaintiff] did not understand or intend to release future claims for mesothelioma."[2] Plaintiff died shortly after his opposition papers were filed.

## II.

"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833 [2014], quoting Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see CPLR 3212 [b]). "If the moving party meets this burden, the burden then shifts to the non-moving party to 'establish the existence of material issues of fact which require a trial of the action'" (Jacobsen, 22 NY3d at 833, quoting Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]). In determining whether the non-moving party has created an issue of fact warranting denial of summary judgment, we are bound by the assertions raised in opposition below (see Torres v Jones, 26 NY3d 742, 764 n 5 [2016] [finding argument in support of motion for summary judgment not preserved where plaintiff did not raise it

---

[2] Plaintiff also asserts that the release is invalid as a matter of law under section 5 of the Federal Employers' Liability Act (45 USC § 55). As the majority seems to recognize (see majority op at 7-8), that arguments fails under Callen v Pennsylvania Railroad Co. (332 US 625, 631 [1948] ["It is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability . . . Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation"]).

at trial court or cite supporting testimony]; <u>Bingham v New York City Transit Authority</u>, 99 NY2d 355, 359 [2003] [rejecting an argument in support of summary judgment raised for the first time on appeal]).[3]

As the majority explains, in the context of a release signed by a seaman, federal admiralty law provides that "the burden is upon one who sets up a seaman's release" to demonstrate (1) "that it was executed freely, without deception or coercion," and (2) "that it was made by the seaman with full understanding of his rights" (<u>Garrett v Moore-McCormack Co.</u>, 317 US 239, 248 [1942]; majority op at 8). "The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of [the seaman's] understanding" (<u>Garrett</u>, 317 US at 248).

Texaco does not dispute that it bears the burden of proving the validity of the release (<u>see</u> majority op at 7). But while the law is "solicitous of seamen . . . it does not prevent them from entering into informed and voluntary settlements and from giving binding releases in connection therewith" (<u>Pereira v Boa Viagem Fishing Corp.</u>, 11 F Supp 2d 151, 153 [D Mass 1998]).[4]

---

[3] Although federal law governs the substance of this dispute (i.e., the validity of the release), New York law governs the procedural standard for determining a party's entitlement to summary judgment.

[4] Both parties agree that, because plaintiff is a seaman, the <u>Garrett</u> standard governs (<u>see</u> majority op at 7-8). That said, this Court has noted that "there is something antiquated in the idea that seamen are less capable than other people of making contracts for themselves" and, for that reason, the <u>Garrett</u> doctrine "has shown some signs of erosion" (<u>Schreiber v K-Sea Transp. Corp.</u>, 9 NY3d 331, 339-340 [2007]).

III.

In support of its summary judgment motion, defendant proffered the duly executed release as well as plaintiff's 1997 complaint. The release provides, in no uncertain terms, that plaintiff discharged Texaco from "any and all claims" – including "any new or different diagnosis" he may receive – resulting from plaintiff's alleged asbestos exposure. Plaintiff does not dispute the authenticity of the release.

Turning to the <u>Garrett</u> factors, the majority apparently acknowledges that there is no issue as to whether the release was executed freely, without deception or coercion (<u>Garrett</u>, 317 US at 248; majority op at 11). Plaintiff acknowledged that he "carefully read" the release, and he swore before a notary public and two witnesses that he fully understood its import. Indeed, the terms of the release itself assure us that plaintiff signed the release "of [his] own free act." Nothing in the record contradicts these statements; plaintiff does not assert that he was somehow pressured or misled into signing the settlement agreement, or that the release was not signed freely and willingly (see <u>Orsini v O/S Seabrooke</u>, 247 F3d 953, 959-960 [9th Cir 2001] [holding that defendant was not entitled to summary judgment where plaintiff alleged that he was "coerced into signing the Release" by the ship's captain and crew]; <u>Castillo v Spiliada Maritime Corp.</u>, 937 F2d 240, 245-246 [5th Cir 1991] [finding that plaintiff's affidavit, alleging a threat that charges would be filed against him if he failed to settle, was sufficient to reverse grant of summary judgment]; <u>Davis v American Commercial Lines, Inc.</u>, 823 F2d 1006, 1008 [6th Cir 1987] [holding

that defendant was not entitled to summary judgment where plaintiff alleged specific instances of "over-reaching and misrepresentation by defendants"]).

With respect to the second part of the Garrett analysis, defendant sufficiently established that plaintiff entered into the release with a full understanding of his rights. As to the adequacy of the consideration, the majority does not contend that there is anything inherently unfair about the $1,750 Texaco paid to settle plaintiff's claim (majority op at 12; see Baker v Helix Energy Solutions Group, Inc., 469 F Appx 327, 328-329 [5th Cir 2012] [affirming defendant's award of summary judgment where plaintiff received consideration of $4,800]; Sitchon v American Export Lines, 113 F2d 830, 830 [2d Cir 1940] [affirming defendant's award of summary judgment where plaintiff received consideration of $180]). In addition to suing Texaco, plaintiff also sought to collect from 115 other defendants – among them, large ship owners and major asbestos manufacturers. As to defendant's percentage of potential liability, plaintiff concedes that he spent fewer than 2 of his 37 years of service aboard Texaco's ships. Texaco also settled plaintiff's claims expeditiously – less than two months after plaintiff filed suit. That settlement included the thousands of other plaintiffs also represented by plaintiff's counsel, resulting in one lump sum payment to plaintiff's law firm. It is undisputed that defendant was not involved in determining "what portion of the total sum" would be allocated to plaintiff (majority op at 3).

Significantly, Texaco consistently "denie[d] any and all liability," contending that it was responsible for $0 in damages. As defendants often do, Texaco offered payment as

a "compromise" in order to "resolve the dispute between the parties" and "terminate" plaintiff's claims. Nor was the consideration "meager" relative to plaintiff's medical condition: at the time of the settlement, plaintiff did not have mesothelioma. The release encompassed the *risk* that he might develop the disease, as well as the *risk* that Texaco would be found liable. Of course, had plaintiff rejected a settlement in favor of trial, he may have recovered an even lower sum – or nothing at all.

With regard to legal advice, plaintiff was represented by counsel – an admiralty law firm. As the release makes clear, plaintiff discussed its contents with his attorney in order to ensure that he had "full knowledge of the contents and the purpose" of the release.[5] Because plaintiff was "represented by counsel," the "need for the Court to determine whether [he] fully understood his rights when executing [the] release is reduced" (Nicolich v City of NY, 1996 WL 99392, at *2 [SD NY Mar 6, 1996, No. 95-cv-0053]; see also Borne v A & P Boat Rentals No. 4, Inc., 780 F2d 1254, 1258 [5th Cir 1986] ["When a seaman is acting upon independent advice and that advice is disinterested and based on a reasonable investigation, there being no question of competence, a settlement agreement will not be set aside"]). Plaintiff has not challenged counsel's competence, or otherwise questioned the adequacy of the legal advice he received.

---

[5] The majority suggests that this recitation was employed to "circumvent[]" – rather than satisfy – defendant's Garrett burden (see majority op at 11). That logic sets up an unworkable standard for maritime employers: the majority implores parties to write "careful and precise" releases (majority op at 9 n 3), then distrusts the careful and precise language they use (majority op at 11).

As to medical advice, plaintiff concedes that, at the time he signed the release, he had received a firm diagnosis: bilateral asbestos related pleural disease. Evidently, plaintiff also had been advised that serious health complications may be associated with his exposure to asbestos. As the complaint makes clear, he was aware of a number of potential medical risks from asbestos exposure, including lung cancer, rectal cancer, colon cancer, and mesothelioma, to name a few. The complaint also notes, among other things, that plaintiff "suffer[ed] harm in the form of necessity to be monitored for other asbestotic diseases." Plaintiff has not countered any of these statements, nor has he asserted that he received faulty or otherwise inadequate medical advice.

Citing the release itself, plaintiff asserts that the "boilerplate" language, coupled with the absence of any mention of mesothelioma, demonstrates that plaintiff did not intend to relinquish his current claim. In support of these arguments, plaintiff compares his release to those executed in Wicker v Consolidated Rail Corp. (142 F3d 690, 694-695 [3d Cir 1998]). In Wicker, several plaintiffs sued their employer for asbestos-related injuries. The parties settled, and the plaintiffs each signed a general release. Thereafter, the plaintiffs filed another lawsuit. The plaintiffs in Wicker conceded that their earlier releases barred claims related to their asbestos exposure (id. at 694), but argued that the releases did not bar their new claims based on exposure to other toxins. The Wicker court invalidated the "boiler plate" agreements, noting that one of the releases "merely recite[d] a series of generic hazards to which [plaintiffs] might have been exposed, rather than specific risks the employees faced during the course of their employment" (id. at 701). Inclusion of those

"generic hazards," the court held, was insufficient to establish that the plaintiff intended to relinquish his right to bring suit for injuries sustained as a result of exposure to other toxins. With respect to another plaintiff's "short, *pro forma* waiver[]," the <u>Wicker</u> court concluded that the release "d[id] not indicate the parties negotiated any part of the release[] other than the amount of settlement" (<u>id.</u>).

Here, unlike in <u>Wicker</u>, plaintiff expressly brought suit for injuries sustained from the *very same* asbestos exposure that formed the basis of his earlier claims – claims that even the <u>Wicker</u> plaintiffs acknowledged were barred by their earlier releases (<u>id.</u> at 694). Far from resembling a laundry list of generic hazards, plaintiff's release of Texaco includes agreed-upon carve-outs, specifically exempting "benzene or products containing benzene" from its scope (<u>see</u> <u>id.</u> at 701). Moreover, unlike the release in <u>Wicker</u>, plaintiff's release "recite[s] that plaintiff was aware of and understood the other risks to which he was exposed" (<u>id.</u> at 702). In fact, plaintiff expressly recognized the possibility that, as a result of his exposure, he might later face a "new or different diagnosis." Nonetheless, plaintiff released "any and all known or unknown, present or future, foreseen or unforeseen" injuries that may arise. By its plain terms, then, the release conclusively rebuts plaintiff's contention that it covers only those conditions mentioned by name.

In any event, plaintiff's *own* complaint makes clear that plaintiff was aware that mesothelioma was a "potential health risk[] to which he had been exposed" (<u>id.</u> at 701-702). In his 1997 suit, plaintiff explicitly acknowledged that, "as a direct and proximate result" of his alleged exposure, he suffers "cancerphobia . . . , pneumoconiosis as well as

exacerbation of existing diseases; and . . . pulmonary diseases <u>inclusive of . . .</u> <u>mesothelioma</u>” (emphasis added).  Indeed, plaintiff sought to recover the “costs of being forever medically monitored for disease onset and worsening,” as well as damages for “harm in the form of necessity to be monitored for other asbestotic diseases.”  Plaintiff's current contention that he was unaware of the risk of mesothelioma is therefore belied by his own prior statements.

In relying on the “absence of mesothelioma” from the release (majority op at 10), the majority now requires settling parties to exhaustively catalog all conceivable, asbestos-related diseases – even those the plaintiff has specifically acknowledged – in order to release them.  Not only does this undermine the parties' clear intent, it essentially precludes maritime plaintiffs from settling unknown or unforeseen claims.  Here, for instance, while the release does not “mention mesothelioma” by name (majority op at 9), mesothelioma was still a “known” risk – recognized in plaintiff's complaint – encapsulated by the plain language of the release.  Indeed, the release did not mention *any* health risks by name, including bilateral asbestos related pleural disease.  Similarly, the release seeks to cover plaintiff's “unknown” and “unforeseen” injuries but, by definition, those conditions cannot be identified.  Under the majority's rule, plaintiff apparently did not release any of these unenumerated claims – or perhaps any claims at all – even though the text of the release was designed to accomplish that precise result.

In sum, even under its heightened <u>Garrett</u> burden, defendant has tendered sufficient evidence to demonstrate the absence of any material issue of fact, thereby shifting the

burden of proof to plaintiff to establish a material issue of fact (Stivason v Love, 122 F3d 1074 [Table], *3 [9th Cir 1997] [noting that the "objective evidence establishes that (plaintiff) understood what he was doing when he signed the settlement"]).

IV.

In denying summary judgment, the majority asserts that the record "is silent or ambiguous" on a number of supposedly material facts (majority op at 11).  But any remaining gaps in the record are reflective only of *plaintiff*'s failure to come forward with any allegations – let alone proof – to rebut the assertions in defendant's motion. Conspicuously absent from the record is any testimony, affidavit, or statement from plaintiff asserting coercion, fraud, duress, incapacity, misunderstanding, lack of counsel, or any similar allegation that might warrant denial of summary judgment (compare Simpson v Lykes Bros. Inc., 22 F3d 601, 601, 603 [5th Cir 1994] [granting summary judgment to defendant because plaintiff failed to submit an affidavit contradicting the plain language of the release to establish an issue of fact], and Nicolich, 1996 WL 99392, at *3 n 4 [granting summary judgment to defendant because "counsel's own affirmation stating that 'plaintiff never intended to release the defendant of the claim' . . . cannot be used to create a factual dispute as to (p)laintiff's intent because it is not based on personal knowledge"] with Davis, 823 F2d at 1008-1009 [denying defendant's motion for summary judgment based on plaintiff's affidavit which raised issues of fact concerning plaintiff's understanding of his rights, including allegations that defendant stated "that counsel would not be necessary to settle this type of claim"], and Halliburton v Ocean Drilling &

Exploration Co., 620 F2d 444, 444 [5th Cir 1980] [relying on affidavit from plaintiff's physician, which indicated that plaintiff suffered from diminished mental capacity at the time of settlement, to reverse grant of summary judgment], and Aguiluz-Nunez v Carnival Cruise Lines, Inc., 584 F2d 76, 78 [5th Cir 1978] [finding that plaintiff's affidavit and deposition testimony, which alleged that "the significance of the release was not explained to him, that his legal rights were not discussed . . . created a genuine issue of material fact (as to) whether (he) executed the release with full comprehension of the effects of his action"], and Blanco v Moran Shipping Co., 483 F2d 63, 64 [5th Cir 1973] [holding that defendant was not entitled to summary judgment where the plaintiff, who "spoke and understood only Spanish," alleged that he "did not understand the legal effect of the release and executed it because he thought it represented no more than a receipt for his wages aboard (the) ship"], and Irons v Matthews, 2010 WL 2540347, at *9 [DNJ June 15, 2010, No. 04–4825] [denying summary judgment where the record included affidavits and deposition testimony indicating that plaintiff "did not consult with an attorney" and that "his rights, including claims of maintenance and cure, (were never) explained to him"], and King v Waterman S S Corp., 61 F Supp 969, 970 [SD NY 1945] [denying summary judgment based on affidavits indicating that plaintiff settled "without a full understanding of his legal rights and with inadequate information regarding his injuries"]). At bottom, defendant carried its burden of proof, and plaintiff did not raise a single triable issue of fact in opposition.

The majority's speculative assertions regarding conceivable – but unalleged – additional facts cannot cure this glaring deficit (see Stivason, 122 F3d at *3). Plaintiff does not assert, for instance, that the release is invalid because of "how many cases Texaco settled," or "how much Texaco paid to settle as a lump sum," or "the considerations [ ] that led to the allocation" of the settlement amount (majority op at 12). Plaintiff similarly does not argue that "the competence of [his] 1997 counsel" should be "questioned" (majority op at 13). Nor does he assert a "lack of knowledge as to his condition at the time he signed the release" (majority op at 10), or that any "medical records documenting [his] condition" will demonstrate the release's invalidity (majority op at 12). Rather, the *majority* makes these scattered arguments on plaintiff's behalf, faulting defendant for failing to disprove every hypothetical assertion.[6]

Regrettably, the majority's holding sets a hopelessly high bar for defendants tasked with demonstrating the validity of a seaman's release. The majority's Garrett analysis resembles a blanket prohibition on settlements with seamen – a result that has been repeatedly rejected by federal courts (see Simpson, 22 F3d at 603 [granting defendant's motion for summary judgment based on a valid release by the seaman plaintiff]; Nicolich, 1996 WL 99392, at *3 n 4 [same]; see also Sitchon, 113 F2d at 832 ["If such a settlement as the one in the case at bar is voidable, no release by a seaman could ever be free from

---

[6] The majority also references a number of extraneous facts – for instance, that plaintiff signed the release "one day after Christmas," and that he was "in Florida" at the time (majority op at 11). Plaintiff argues no connection between these facts and the validity of the release. In any event, whether any meaningful inference may be drawn from them is both unclear and unexplained.

attack, if he subsequently discovered that his injuries were greater than he anticipated when he executed the release"]; McBrien v U.S. Petroleum Carrier's Inc., 177 F Supp 627, 635 [SD NY 1959] ["If a release is to be held invalid under these circumstances it would be virtually impossible to settle seamen's cases without litigation or for a ship owner to purchase his peace at a reasonable and fair figure"]).  Even worse, the majority's holding disturbs the finality of existing settlement agreements and, in doing so, discourages the swift resolution of these types of disputes (Borne, 780 F2d at 1257 ["If employers are denied any degree of confidence in the finality of a settlement, a seaman will lose the option to settle since employers will have little incentive to avoid a full-scale trial on the merits"]).  That result is "no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into the courts" (Sitchon, 113 F2d at 832).

Purportedly applying federal law, the majority turns New York into a destination venue for seaman plaintiffs who no longer wish to abide by the terms of their valid settlements.  That result is wrong on the law, and undermines the many important policy goals furthered by settlement agreements.

V.

Plaintiff negotiated and executed a release covering the risk that he would develop mesothelioma as a result of his alleged asbestos exposure aboard defendant's vessel. Defendant demonstrated the validity of that release, and plaintiff failed to contradict any of defendant's assertions.  Defendant is therefore entitled to summary judgment.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed, with costs, and certified question answered in the affirmative.  Opinion by Judge Wilson.  Judges Rivera, Fahey and Feinman concur.  Judge Garcia dissents in an opinion in which Chief Judge DiFiore and Judge Stein concur.

Decided February 21, 2019